SCHOTT, Judge.
This is an appeal by the Louisiana State Racing Commission from a judgment of the district court which reversed a decision of the Commission suspending plaintiff’s license as a trainer. The issue is whether evidence of Benzocaine found in a urine sample from the trainer’s horse was sufficient to support the commission’s decision that the Rules of Racing had been violated.
On May 19, 1983, “Raised Glass”, a two year old filly trained by plaintiff, finished first in the sixth race at Louisiana Downs. In keeping with the Rules a sample of urine was collected and sent to a laboratory for testing. On May 24 the Senior Steward was notified that the sample was positive for Benzocaine, and plaintiff was notified that a hearing before the stewards was scheduled for May 26. Following the hearing the stewards issued ruling number 226 in which they concluded “that the drug contained in the sample could have produced analgesia in, stimulated, or depressed the horse, or could have masked or screened a drug, not permitted by LAC 11-6:54, that could have produced analgesia in, stimulated or depressed the horse.” They suspended plaintiff for thirty days.
After a hearing before the commission the ruling of the stewards was affirmed, and plaintiff filed a petition for judicial review pursuant to LSA-R.S. 49:964. The trial court reversed the order of the commission, and the commission has appealed pursuant to R.S. 49:965. In this court the commission contends that plaintiff failed to demonstrate to the district court that his rights were prejudiced as required by R.S. 49:964 G. The trial court did not assign any reasons for judgment but apparently found that the commission’s decision was manifestly erroneous. Plaintiff contends that his substantial rights were prejudiced before the commission because its findings and conclusions were affected by error of law, arbitrary, capricious, abusive of its discretion and manifestly erroneous. Specifically, plaintiff contends he was denied the opportunity to have a split sample of the horse’s urine tested, and that Benzo-caine was not shown to be a prohibited substance.
*141 The substantive rule which plaintiff was found to have violated is LAC 11-6:53.9. It provides:
“The use of a stimulant, depressant, or anesthetic in a manner that might affect, or tend to affect, the racing performance of a horse is prohibited.”
Pertinent to the case are the following procedural rules:
LAC 11-6:53.15 “When a report is received from the State chemist reflecting in his expert opinion that the chemical analysis of blood, saliva, urine, or other samples taken from a horse indicate the presence of a forbidden narcotic, stimulant, depressant, or analgesic, local anesthetic or drugs of any description, not permitted by LAC 11-6:54, this shall be taken as prima facie evidence that such has been administered to the horse. Such shall also be taken as prima facie evidence that the owner, and/or trainer, and/or groom has been negligent in handling of the horse.”
LAC 11-6:53.17 “When a report as described in Section 53.15 is received from the State chemist, the stewards shall conduct an investigation and a hearing. There shall be no ruling and the stable shall remain in good standing pending a ruling by the stewards. However, the horse allegedly to have been administered any such chemical substance or material shall not enter in a race during the investigation and hearing.”
LAC 11-6:53.18 “The trainer and/or assistant trainer shall be responsible for and be the absolute insurer of the condition of the horses he enters regardless of acts of third parties. Trainers and/or assistant trainers are presumed to know the rules of the Commission.”
LAC 11-6:53.19 “Should the chemical analysis of any sample of the blood, saliva, urine, or other excretions of body fluids of any horse so analyzed contain any narcotic, stimulant, depressant, local anesthetic, analgesic, or drugs of any description, not permitted by LAC 11-6:54, the trainer of the horse may, after a hearing of the stewards, be suspended or ruled off, if the stewards conclude that the drug contained in the sample could have produced analgesia in, stimulated, or depressed the horse, or could have masked or screened a drug, not permitted by LAC 11-6:54, that could have produced analgesia in, stimulated or depressed the horse. ...”
LAC 11-6:53.37 “The following procedure is hereby established for the testing of a split or referee sample.
After a horse has voided and its urine collected for testing, the volume of urine collected shall be split or divided into approximately equal parts, one being processed for initial laboratory testing for the detection of the presence of prohibited drugs or substances therein. The remaining part shall be identified as the split or referee sample to be processed for future testing under the procedures hereby established. Both parts shall be treated with a proper amount of ascorbic acid to preserve the sample against deterioration of the sample ingredients.
⅜! * * * * *
Within five days from the date the stewards notify a trainer that the initial laboratory test on a urine or blood specimen from a horse entered and raced by him was positive for the presence of a prohibited drug or substance, the trainer must request the stewards to have the split or referee sample tested by an alternate laboratory as provided herein. At the time of his request the trainer must deposit the sum of $300 with the stewards to cover all expenses to be incurred in testing the split or referee sample. The stewards shall forward the $300 deposit to the state chemical testing laboratory. Failure of a trainer to make a timely request to the steward constitutes a waiver of any and all rights to have the split or referee sample tested....”
Since the state chemist’s report was positive for Benzocaine the burden of proof was on plaintiff to disprove the presence of the substance in the horse’s urine. 53.15. The most effective method of carrying the burden would seem to be the production of *142 a negative report on the split sample. Plaintiff was notified that the horse’s urine was positive for Benzoeaine on May 24, 1983 and had five days in which to request the stewards to have the split tested and to pay $300 for the test. 53.37.1. Plaintiff testified he made the request to the stewards, but at the same time he wanted to enter the horse in a stake race that day. He was told he could race the horse but by doing so would forfeit the right to have a test on the split sample. When asked by a commission member why the stewards said he couldn’t have the split sample tested, plaintiff replied:
“... All I recall is I was told no. And the reason was that I couldn’t have one, you know, all I could have was one at a time. I couldn’t have both a suspensive appeal and the split sample. All I was told was I could have just one. So, I chose the appeal in order to run the filly in the stake race.”
Plaintiff contends that nothing in the rules purports to deprive him of his right to have the split tested because of his appeal from the stewards’ ruling. Furthermore, says plaintiff, such a rule would deny him due process, even if it did exist.
Once the stewards had the positive report from the chemist they were obliged to conduct an investigation, and while this was in progress plaintiff was prohibited from entering “Raised Glass” in any race. 53.17. At the time plaintiff spoke to the stewards, their investigation had been completed, and it was up to plaintiff to request a test on the split sample in continuation of the investigation. By telling the stewards he was going to "enter the horse in a race he told them, in effect, that the investigation was over without the addition of test results on the split sample. Thus, it appears that the stewards correctly applied the rule, but the rule in itself seems unreasonable.
The split sample was present and available for testing, having been preserved for this purpose in accordance with 53.37.1. Entering the horse in a race while the sample was being tested could have no effect on the investigation’s outcome. On the other hand, to require a trainer to forgo what may be the only effective defensive weapon available to him if he enters the horse in a race seems quite unreasonable. In any event, under the circumstances of this case, we are convinced that plaintiff acquiesced in the stewards’ ruling and waived his right to have the split sample tested. A reading of his quoted testimony above demonstrates that he did not protest their decision that he could not have the split sample tested, but, instead, he accepted it. Furthermore, he failed to tender the $300 fee which must be deposited at the time the request is made. 53.37.-1. In order to preserve his rights it was encumbent on plaintiff to follow the rule which he was presumed to know. 53.18.
Thus, when the case was before the commission, plaintiff was confronted with a prima facie case that Benzoeaine was in his horse’s urine. Since he had no conflicting test results he was relegated to denying he used the substance on the horse. However, this testimony was entitled to little if any weight considering the “absolute insurer” rule, 53.18. Nevertheless, the commission’s case was not completed simply on a showing that “Raised Glass” had some trace of Benzoeaine in her urine. It was encumbent on the commission to prove that this substance was a stimulant, depressant, or anesthetic used on the horse in a manner that might affect, or tend to affect, the racing performance of the horse. 53.9.
Plaintiff produced a veterinarian, Dr. Kenneth Paul Reed, who testified that Ben-zocaine is a topical anesthetic of low water solubility so that it does not penetrate the surface of the skin. He stated if Benzo-caine had been applied to “Raised Glass” it could not affect her ability to run, would not produce analgesia, and would not stimulate or depress her. Asked what is the sum total effect of Benzoeaine on a horse he replied:
“It has almost no effect whatsoever according to everything we can find, except *143 strictly on the skin. If you have a mild sunburn, and I repeat a mild sunburn, it will alleviate the irritation of the sunburn or poison ivy attack. But, as far as any analgesia, it has none.”
The commission questioned Dr. Reed extensively as to why the substance is used and its effects. One member asked him if he agreed it was a local pain reliever and he replied that if one had a mild skin abrasion Benzocaine would provide “very mild relief at those terminal nerve endings.” Finally, various commission members asked him repeatedly whether the substance could in some manner or to some extent affect a horse’s performance and he steadfastly maintained that it would not.
The commission called its own Commission Veterinarian, Dr. Frank J. Douglas, Jr. who testified that Benzocaine was a problem for the commission in that published literature indicates it cannot be absorbed through the skin, and yet it began to show up in horses. Because he could not correlate the information he was getting he ran a test himself. He made a mixture of a substance called DSMO, Benzocaine, and aspirin, and applied it to a lame pony. In twenty minutes the pony became sound. He concluded that either the aspirin or the Benzocaine made the pony sound and he indicated that he would have to try the same kind of experiment omitting aspirin from the compound to determine whether Benzocaine alone would have such an effect on a horse.
There is no evidence in the record to show that Benzocaine is an anesthetic which was used on “Raised Glass” in a manner that might affect, or tend to affect, the horse’s racing performance. The sum total of the evidence is that there was some amount of Benzocaine in her urine, but this is not what is prohibited. Apparently, the trial judge concluded that the commission erred manifestly in reaching its decision. We agree with the trial court and affirm the judgment.
AFFIRMED.
REDMANN, C.J., dissents, assigning reasons.